[Cite as *State v. Luther*, 2018-Ohio-4568.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-L-039** |
| DOMINIC J. LUTHER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 2017 CR 000767.

Judgment: Reversed and remanded.


*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer*, Lake County Public Defender, and *Vanessa R. Clapp*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).


TIMOTHY P. CANNON, J.

{¶1} Appellant, Dominic J. Luther, appeals from the Lake County Court of Common Pleas' February 26, 2018 judgment entry sentencing appellant to three years of community control following a no contest plea to possession of heroin, aggravated possession of drugs, and possession of drug abuse instruments. At issue on appeal is the trial court's denial of appellant's motion to suppress. The judgment is reversed and this matter is remanded to the trial court.

{¶2} A criminal complaint was filed in Willoughby Municipal Court on July 3, 2017, charging appellant with possession of heroin. The matter was bound over to the Lake County Court of Common Pleas, and appellant was indicted by the grand jury on September 15, 2017, for (1) possession of heroin (0.16 grams), a fifth-degree felony in violation of R.C. 2925.11; (2) aggravated possession of drugs (a substance containing fentanyl and carfentanil), a fifth-degree felony in violation of R.C. 2925.11; and (3) possessing drug abuse instruments, a second-degree misdemeanor in violation of R.C. 2925.12. All three counts included forfeiture specifications.

{¶3} Appellant filed a motion to suppress all evidence obtained as a result of the pat-down search that prompted his arrest. Appellant argued the arresting officers violated his constitutional rights by conducting an unreasonable search and seizure without a warrant. A hearing was held, at which the arresting officers and representatives from the Lake County Crime Laboratory testified.

{¶4} The trial court denied appellant's motion to suppress on December 19, 2017.

{¶5} On December 20, 2017, appellant pleaded "no contest" to each count in the indictment. A presentence investigation report was completed. Appellant was sentenced on February 14, 2018, to three years of community control. The trial court's judgment entry of sentence was filed February 26, 2018, and this appeal followed.

{¶6} Appellant raises one assignment of error for our review:

{¶7} "The trial court erred by denying the defendant-appellant's motion to suppress in violation of his due process rights and rights against unreasonable search and seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 14 of the Ohio Constitution."

{¶8} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. 'An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Polk*, 150 Ohio St.3d 29, 2017-Ohio-2735, ¶35, quoting *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, ¶7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8.

{¶9} The following factual findings, as made by the trial court, are supported by competent, credible evidence.

{¶10} On July 1, 2017, the Eastlake Police Department received a report of indecent exposure (public urination) at 34150 Beachpark Drive. Dispatch described the suspect as a white male, six feet tall, wearing a long-sleeve grey shirt and dark pants. Officer Gary Hotchkiss and Officer Christopher Weber responded from the police department. Less than two minutes later, Officer Weber was traveling west on Beachpark Drive when he saw appellant riding towards him on a bicycle that appeared too small for him. Appellant, a white male, was wearing dark pants and a three-quarter-sleeve shirt that appeared to be dark grey; Officer Weber could not determine appellant's height because of the way he was riding the bicycle. It was later determined that appellant is five feet and six inches tall. Officer Weber asked dispatch to repeat the description and confirm the address. After appellant's eyes met Officer Weber's, appellant turned onto 349th Street and started peddling faster. Officer Weber followed appellant, and Officer Hotchkiss was approximately 30-40 feet behind. Appellant dropped the bicycle in the grass near a house that fronted on Roberts Road and started walking across the back

3

yard but did not approach the house. Officer Weber asked appellant to come over and speak with him, and appellant complied.

{¶11} Officer Weber conducted a pat-down search for officer safety because it appeared appellant had tried to evade the officers on his bicycle, was "pouring sweat," appeared nervous and agitated, and kept looking around as though he was considering trying to escape. Both officers testified that, in their experience, a suspect looking to flee poses a risk to officer safety because the suspect might harm an officer to create an opportunity to flee.

{¶12} Officer Weber felt a large, sturdy object in appellant's right front pants pocket, which appellant claimed was "cigarettes." Because the sturdy object was not consistent with the feel of cigarettes, Officer Weber was concerned it might be a weapon. He removed the object from appellant's pocket. It was a silver "clamshell" case, approximately 4 inches long by 2¾ inches wide by ½ inch thick. Because it appeared to him large enough to contain a razor blade, knife, or small-caliber gun, Officer Weber opened the case. Inside was a razor blade, two syringes, and a paper fold with an off-white powder inside.[1] The officers arrested appellant on charges of possessing drugs and drug abuse instruments.[2]

---

1. The Lake County Crime Laboratory later confirmed that the paper fold contained a mixture of heroin and carfentanil; heroin residue was found on the razor blade; and residue from heroin, fentanyl, and carfentanil was found on one of the syringes.

2. Although not included in the trial court's factual findings, we note the officers testified that appellant was placed in the back of a patrol car and transported to the area of the initial dispatch to inquire if appellant was the subject of the indecent exposure/public urination report. Another white male matching the same clothing description was in the driveway of 34150 Beachpark Drive. It was determined that this second male either lived or was staying at that residence, and he claimed to have no knowledge of the indecent exposure/public urination call.

**{¶13}** On appeal, appellant challenges the pat-down search conducted by Officer Weber; he does not challenge the propriety of the initial investigatory stop.

**{¶14}** Appellant asserts the arresting officers possessed no specific or articulable facts or reasonable suspicion upon which to base the search of his person when he was stopped for questioning related to a report of a man urinating in public. Thus, he argues the continued detention and search of his person violated his constitutionally guaranteed right to be free from unreasonable searches and seizures, and any evidence obtained as a result must be suppressed.

**{¶15}** "Courts must exclude evidence obtained by searches and seizures that violate the Fourth Amendment." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶181, citing *Mapp v. Ohio*, 367 U.S. 643 (1961) (extending the exclusionary rule to the states). "'The primary purpose of the exclusionary rule is to remove incentive from the police to violate the Fourth Amendment.'" *State v. Eggleston*, 11th Dist. Trumbull No. 2014-T-0068, 2015-Ohio-958, ¶17, quoting *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶29.

**{¶16}** The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The language of Article I, Section 14 of the Ohio Constitution is nearly identical, and it has been interpreted by the Ohio Supreme Court as affording the same protection as the Fourth Amendment. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239 (1997).

5

{¶17} "'The touchstone of the Fourth Amendment is reasonableness.'" *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶14, quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "'"[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case."'" *Id.*, quoting *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976), quoting *Cooper v. California*, 386 U.S. 58, 59 (1967). "[W]arrantless searches are per se unreasonable without prior approval by a judge or magistrate, subject to only a few specific exceptions." *Id.* at ¶15, citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009), citing *Katz v. United States*, 389 U.S. 347, 357 (1967).

{¶18} One exception to the warrant requirement is a brief investigatory stop based upon reasonable suspicion of recent, ongoing, or imminent criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968). An investigatory stop may include a limited protective search for the safety of the officer and the public. *Id.* at 27; *see also State v. Bobo*, 37 Ohio St.3d 177, 180 (1988).

{¶19} "The frisk, or protective search, approved in *Terry* is limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous." *State v. Andrews*, 57 Ohio St.3d 86, 89 (1991), citing *Terry*, *supra*, at 27. "While probable cause is not required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances." *Id.* "The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence." *Id.*, citing *Terry*, *supra*, at 24, 30; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972).

6

{¶20} "'A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. * * * Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby * * *.'" *State v. Evans*, 67 Ohio St.3d 405, 414 (1993), quoting *Terry*, *supra*, at 25-26. "[W]hen an officer is conducting a lawful pat-down search for weapons and discovers an object on the suspect's person which the officer, through his or her sense of touch, reasonably believes could be a weapon, the officer may seize the object as long as the search stays within the bounds of [*Terry*]." *Id.* at paragraph two of the syllabus. Conversely, "once the officer determines from his sense of touch that an object is not a weapon, the pat-down frisk must stop. The officer, having satisfied himself or herself that the suspect has no weapon, is not justified in employing *Terry* as a pretext for a search for contraband." *Id.* at 414.

{¶21} We determine the totality of the circumstances demonstrates that Officer Weber had a reasonable suspicion that appellant, whom he was investigating at close range, may have been armed and dangerous. Both officers testified they were concerned appellant might try to harm them in order to flee because it appeared appellant had attempted to evade the officers on his bicycle, was sweating profusely, refused to make eye contact, and was looking around as though for an escape route. Thus, the decision to conduct a pat-down search to determine whether appellant was armed was not unreasonable.

{¶22} We further conclude that Officer Weber acted within the scope of *Terry* when he retrieved the metal case from appellant's pocket. Officer Weber testified the object felt large and sturdy, which was not consistent with appellant's answer that it was "cigarettes." Through his sense of touch and his experience as a police officer, Officer

7

Weber could not conclude that the object, while still inside appellant's pocket, was not a weapon. Removing it was a reasonable precaution in order to assess the object and to proceed with his investigation safely.

{¶23} We conclude, however, that Officer Weber exceeded the scope of *Terry* when he opened the metal case, as it was not based on a reasonable suspicion that it contained a weapon that might harm the officers or others nearby.

{¶24} According to Officer Weber's testimony, appellant stated the object in his pocket was "cigarettes." When asked if the metal case was consistent with "cigarettes," Officer Weber answered, "I know that those cases are actually marketed as cigarette packs but I have not ever seen one used for cigarettes. I've never, outside of a movie, seen a metal box like that used as a cigarette case." Officer Hotchkiss affirmed that appellant stated the case was his "cigarette container" when it was discovered during the pat-down, and that it was possible the metal case was consistent with something that contains cigarettes or a cigarette pack.

{¶25} Officer Hotchkiss testified it was possible the case could contain a weapon "because of its size and we didn't know what was in it." When asked why he opened the case, Officer Weber stated, "When I saw what it was it wasn't immediately apparent what it contained so I opened it to see if there was a weapon in it." He testified that a stun gun, a pocket knife, razor blades, or a firearm that was broken down could have fit inside the case. Officer Weber also stated that he has taken weapons from suspects that would fit inside the case. He further testified about small-caliber firearms he has encountered that might fit inside the case.

{¶26} The prosecutor introduced photographs of two small firearms that Officer Weber testified he has seen at the Eastlake Police Department. During the testimony of

8

a representative from the Lake County Crime Laboratory, it was determined the photographed firearms were from a collection at the laboratory. The representative testified that the dimensions of one firearm are 3.94 x 2.20 x .73 inches, and the dimensions of the other are 3.65 x 2.45 x .82 inches. No one attempted to actually fit either firearm into the metal case, either before or during the hearing.[3] It is clear from the dimensions of the case, 4.00 by 2.75 x .50, that neither of these firearms would actually fit in the metal case found on appellant. In any event, the photographs of these firearms are irrelevant to the task at hand.

{¶27} We must remain mindful that "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]" *Adams*, 407 U.S. at 146. "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, *supra*, at 21.

{¶28} Here, we find no evidence that would reasonably support a suspicion that the metal case contained a weapon as opposed to cigarettes, as was claimed by appellant. The case itself was not contraband. Officer Weber testified to his trained instinct that the case did not contain cigarettes. Once it was in the hands of the officer in the circumstances presented here, however, there was no basis for Officer Weber to form a belief that the small case contained a weapon that could harm him or others nearby. Accordingly, under the circumstances at hand, once the officers identified that the object

---

3. Because the metal case contained fentanyl and carfentanil, it remained at the crime laboratory during the hearings. The trial court judge indicated he would visit the crime laboratory after the hearing was concluded to view the metal case. Photographs of the metal case were presented at the hearing in its place.

in appellant's pocket was a metal cigarette case and not a weapon, we hold any further search by opening the case was beyond the scope of *Terry*. Again, as stated in *Adams* and *Evans*, a protective search is not to be used as a pretext to search for evidence of a crime.

{¶29} We find further support for this determination in a case out of the Second Appellate District, which provides:

> Finally, we note that '[i]n determining what objects might be a weapon, consideration must be given to what types of objects could be so employed in the setting of the particular case.' 'Generally speaking, it may be said that certain items which might be employed as weapons in a surprise attack from the rear would not be effective during the face-to-face encounter of a field interrogation. And in a particular situation, it may be apparent that a particular type of weapon would be of no use because of the superior police presence.' These case-specific considerations militate against a finding that the container in Howard's pocket even posed a realistic threat to officer safety on the basis that it could hold razor blades.

*State v. Howard*, 2d Dist. Montgomery No. 25276, 2013-Ohio-2123, ¶18, quoting 4 LaFave, *Search and Seizure*, Section 9.6(c), at 909 (5th Ed.2012). *See also Evans*, *supra*, at 416, quoting 3 LaFave, *Search and Seizure*, Section 9.4(c), at 522 (2d Ed.1987). ("'[S]omething of the size and flexibility of a razor blade could be concealed virtually anywhere, and accordingly provide the pretext for any search, however thorough.' Such a police procedure would, therefore, be impermissible under *Terry* because it would be tantamount to allowing the more intrusive search incident to custodial arrest to be made without reasonable grounds to arrest.").

{¶30} Similarly here, we find that the face-to-face encounter during daylight hours between two armed police officers and appellant, who was complying with the officers' orders and had only a bicycle by which he could escape, militates against a finding that

any item discovered in that metal case could have posed a realistic threat to the officers' safety, particularly once the officers had possession of the case.

{¶31} "'[T]he touchstone of the Fourth Amendment analysis in determining the reasonableness of a governmental invasion in a citizen's personal security is based on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Eggleston*, *supra*, at ¶35, quoting *State v. Troutman*, 3d Dist. Marion No. 9-11-17, 2012-Ohio-407, ¶43. To that end, we find the scope of the protective search conducted on July 1, 2017, violated appellant's rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. The motion to suppress should have been granted.

{¶32} Appellant's sole assignment of error has merit.

{¶33} The judgment of the Lake County Court of Common Pleas denying appellant's motion to suppress is hereby reversed. This matter is remanded for further proceedings consistent with this opinion.

CYNTHIA WESTCOTT RICE, J., concurs,

THOMAS R. WRIGHT, P.J., concurs in judgment only.